IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SOUND OF MUSIC, LTD. ) | |
| ) | |
| Plaintiff, ) | |
| ) | No.   04 C 6305 |
| v. ) | |
| ) | |
| MUZAK HOLDINGS, LLC, a Delaware ) | HONORABLE DAVID H. COAR |
| Limited Liability Company, MUZAK, LLC, ) | |
| a Delaware Limited Liability Company, and ) | |
| ROB MACINNIS ) | |
| ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

### I. BACKGROUND FACTS

This case arises from an asset purchase agreement apparently gone awry. Both firms were involved in the commercial music transmission business. Plaintiff Sound of Music, Ltd. ("SOM") was an Illinois corporation doing business in Illinois and Wisconsin. Defendant Muzak, LLC ("Muzak") was a Delaware limited liability company operating in Illinois. At all relevant times to this litigation, Muzak was a wholly owned subsidiary of Defendant Muzak Holdings, LLC ("Holdings"), also a Delaware limited liability company doing business in Illinois. The majority of the stock of Holdings was beneficially owned by ABRY Broadcast Partners II and ABRY Broadcast Partners III (collectively, "ABRY"). Defendant Rob MacInnis was an officer of ABRY with access to undisclosed information about the company's financial position. Because Plaintiff attached a number of exhibits to its amended complaint, this Court

-1-

will provide a more detailed background than is customary on a motion to dismiss. These facts are taken from the record and accepted as true for the purposes of this motion only.

On or about February 15, 2001, Muzak offered to purchase the business assets of SOM for approximately $2 million in cash and stock. Muzak mailed a Letter of Intent ("LOI") dated February 15, 2001, to SOM, in which it stated that Muzak would pay "total cash consideration of 45 times the monthly recurring billings" under the accounts transferred at closing. "This purchase price would represent cash of $1,025,000 (assuming monthly recurring billings of $45,000) and Muzak LLC Stock of $1,000,000 (143 Units)." (Am. Compl., Ex. 1, at 2). Muzak's vice president and general counsel, Michael Zendan, then sent a letter to SOM on May 17, 2001, "to provide [SOM] with information regarding the Class A Units, Muzak and Holdings that is relevant to an investment in the Class A Holdings." (Am. Compl., Ex. 4, at 1) (hereafter "Warning Letter"). In this letter, which Defendants characterize as a "warning letter," Muzak advised SOM that Holdings had authorized two series of equity units, common and preferred, and two classes of common units, Class A and Class B. Class A Units carried voting and distribution rights. Receiving Class A Units as consideration for the asset purchase carried risks. Holdings had no operations or assets other than Muzak, but rather relied on dividends from its subsidiaries to meet its obligations and make any distributions. *Id.* at 4. Muzak's ability to make distributions to Holdings was limited by its agreements and by state law. *Id.* In addition, as of March 31, 2001, Holdings had "approximately $385.0 million of debt outstanding," approximately $83.9 million of which carried variable interest rates, and might have to incur more debt in order to meet its obligations. *Id.* at 5-6. As a result, "the terms of [Holdings'] debt impose operational and financial restrictions on our company." *Id.* at 6. Holdings had net losses

in both the previous quarter and previous year, and expected to continue to incur net losses because of acquisitions and debt payments. Thus, Muzak might not attain profitability. Additionally, Muzak was dependent on third-party-owned satellites for the majority of its broadcast transmissions. Potential mergers between Muzak's primary industry competitors also might harm Muzak's performance. Rapid technological change in production and music delivery might render Muzak's technology obsolete. Muzak could lose its license to music rights, might lose key personnel, or face detrimental regulatory changes. *Id*. at 7-11. Further, the Class A Units were not registered under the Securities Act of 1933 or any state securities laws; therefore, they could not be readily offered or sold. There was no secondary trading market for the Class A Units and "none [was] expected to develop." *Id*. at 12. Finally, Holdings did not anticipate making distributions on the Class A Units.

The parties entered an Asset Purchase Agreement ("APA") on May 31, 2001, whereby Plaintiff was to receive $938,696.20 in cash, adjusted as set forth on an attached schedule ("Schedule 2.1"), and 143 Class A Units of Holdings. The APA also included clauses in which Plaintiff's owners represented that they were "sophisticated in financial matters and able to evaluate the risks and benefits of the investment in the Units," (Am. Compl., Ex. 2, ¶ 4.A.2), and that they were "able to bear the economic risk of ... investment in the Units for an indefinite period of time because the Units have not been registered under the Securities Act and, therefore, cannot be sold unless subsequently registered ... or [unless] an exemption ... is available." (*Id*. at ¶ 4.A.3). Finally, Plaintiff warranted that it had "had an opportunity to ask questions and receive answers concerning the terms and conditions of the offering of Units and has had full access to such other information concerning Buyer and Holding as it or he has requested." (*Id.* at ¶ 4.A.4).

The APA included a clause which stated "[t]his Agreement constitutes and contains the entire agreement of the parties and supersedes any and all prior negotiations, correspondence, understandings and agreements between the parties respecting the subject matter hereof. This Agreement may only be amended by written instrument signed by the parties." (*Id*. at ¶ 13.9). Schedule 2.1, which was a "Preliminary Cash Analysis Sheet" dated May 31, 2001,[1] provided a calculation of the net cash portion of the purchase price. The total consideration was given as 45 times recurring billings, or $2,038,696.20. From this total, the value of "Units MLLC," listed as $1,000,000.00 was subtracted, along with $100,000 in pre-settlement escrow payment.

Plaintiff was represented by counsel during the sale of its assets to the defendants.

SOM contends that at all relevant times, Defendants represented that the 143 Units of Class A Stock had a present value of $1 million, or approximately $6,900 per unit. In October 2002, after learning that Defendants had issued Class A units to other buyers at values less than $6,900 per unit, Plaintiff asked Muzak how the $1 million aggregate value was calculated and requested confirmation that the value was true as of the dates of the LOI and that APA. SOM also put the same questions to MacInnis, who responded, in January 2003, that he had used a standard model to compute the valuation of the 143 Units but no longer had physical or electronic copies of the model nor was he able (or willing) to reconstruct the model. In a letter dated March 21, 2003, MacInnis described the "'$1 million' in our deal [as] the value that we *expected* the Units would ultimately deliver to Sound of Music." (Am. Compl., Ex. 6, at 2). The financial model MacInnis used to project the value of the units included assumptions about

---

[1] Schedule 2.1 was dated May 31, 2001, but analyzed SOM's financial picture as of 5/21/2001.

"Muzak's anticipated cash flows and organic and acquisition-driven growth, and our 'best-guess' as to the timing of a liquidity event and the valuation multiple that would apply in that liquidity event." *Id.* at 1.

Plaintiff brought suit in this Court, alleging violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (2000), breach of contract, and fraudulent misrepresentation. Plaintiffs allege that Defendants have engaged in similar misrepresentations about the true value of the purchase price paid in other acquisitions in the industry by conveying securities "which were not worth the promised value." This constitutes the "dissemination of materially false and misleading information and failure to disclose material facts" under § 10(b).

This Court has subject matter jurisdiction over SOM's § 10(b) claim because it arises under federal law, 28 U.S.C. § 1331. Supplemental jurisdiction exists over plaintiff's state law claims in Counts II and III pursuant to 28 U.S.C. § 1367(a). Defendants have brought a motion to dismiss pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 *et seq.* (2004) ("PSLRA"). That motion is fully briefed and now before this Court.[2]

## II.  MOTION TO STRIKE

Before turning to the motion to dismiss, this Court addresses Defendants' motion to strike paragraphs 20 and 28 and exhibit 7 from Plaintiff's amended complaint. Paragraph 20 and

---

[2] Defendant's motion to dismiss reads more like a motion for judgment on the pleadings under Rule 12(c) than a straightforward (even under the PSLRA) motion to dismiss for failure to state a claim. This Court, however, disfavors the unilateral conversion of motions from the form in which they allegedly were filed into the form they more closely resemble as unduly prejudicial to the opposing party, which may have relied, reasonably enough, on the stated basis of the motion in preparing its response. For that reason, Defendants' motion will be treated under Rule 12(b)(6) and argument exceeding the permissible scope will be disregarded.

28 of the amended complaint include allegations about business transactions between Defendant Muzak and other entities which are not parties to this litigation. Exhibit 7 is a portion of an affidavit by Holdings' CEO, William Boyd, in other, unspecified litigation involving defendants.

This Court will strike paragraphs 20 and 28 and Exhibit 7 as impertinent and unduly prejudicial. This is an individual securities fraud lawsuit; there are no allegations about a class action. The allegations in paragraphs 20 and 28 and Exhibit 7 relate to dealings between Muzak and third parties. Plaintiff has failed to allege facts that connect the statements in these paragraphs to the instant litigation. As such, they are impertinent and serve to confuse the issues. *See, e.g.*, *Cumis Ins. Soc., Inc. v. Peters*, 983 F. Supp. 787, 798 (N.D. Ill. 1997). Defendants' motion to strike is GRANTED.

## III. ANALYSIS

### A. Standard of Review

The purpose of a motion to dismiss under Rule 12(b)(6) is to "test the sufficiency of the complaint, not to decide the merits" of the case. *Triad Assocs., Inc. v. Chicago Housing Auth.*, 892 F.2d 583, 586 (7th Cir. 1989). When considering a motion to dismiss, a court must construe all allegations in the complaint in the light most favorable to the plaintiff and accept all well-pleaded facts as true. *Bontkowski v. First Nat'l Bank of Cicero*, 998 F.2d 459, 461 (7th Cir. 1993). A complaint should be dismissed only when "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). If a complaint conforms to the requirements of the Federal Rules of Civil Procedure, it cannot be dismissed "on the ground that it is conclusory or fails to allege facts." *See Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002).

B.     **Count I–Securities Act of 1934**

1.     **Standard of Review**

Unlike an ordinary civil complaint, the PSLRA "essentially returns the class of cases it covers to a very specific version of fact pleading–one that exceeds even the particularity requirement of Federal Rule of Civil Procedure 9(b)." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, __ F.3d __, 2006 WL 172142, *4 (7th Cir. Jan. 25, 2006). Under the PSLRA, a complaint must (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed," and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1), (2) (2004).

2.     **Statute of Limitations**

a.     **Effect of Sarbanes-Oxley Act**

Prior to July 30, 2002, a plaintiff had to bring an action under Section 10(b) of the Securities Exchange Act of 1934 "within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364 (1991). Congress enacted the Sarbanes-Oxley Act on July 30, 2002. Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 804, 116 Stat. 745, 801 (2002), codified in part at 28 U.S.C. § 1658(b). Sarbanes-Oxley expanded the limitations period for claims involving "fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws" from one year to two years after discovery of the facts constituting the violation and within five years after such violation. 28 U.S.C. § 1658(b).

Section 804(b) of the Sarbanes-Oxley Act specifically states that the expanded limitations period "shall apply to all proceedings addressed by this section that are commenced on or after the enactment of this Act." *Id.* Appeals courts in other federal circuits have held that Sarbanes-Oxley is not retroactive and the Seventh Circuit has stated that it finds that position "persuasive." *See Foss v. Bear, Stearns & Co., Inc.*, 394 F.3d 540, 542 (7th Cir. 2005). Thus, if SOM's claim was time-barred at the time Sarbanes-Oxley went into effect, it remained time-barred thereafter. To determine when the limitations period expired, this Court therefore must determine when it began to run.

### b. Inquiry Notice

The statute of limitations clock begins to run when the victim is put on inquiry notice, or, in other words, "when the victim of the alleged fraud became aware of facts that would have led a reasonable person to investigate whether he might have a claim." *Tregenza v. Great Am. Comm'ns Co.*, 12 F.3d 717, 718-19 (7th Cir. 1993), *cert. denied*, 511 U.S. 1085 (1994) (*quoted in Whirlpool Fin'l Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 609 (7th Cir. 1995)). Specifically, the limitation period begins to run "when (often between the date of occurrence and the date of discovery of the fraud) the plaintiff learns, or should have learned through the exercise of ordinary diligence in the protection of one's legal rights, enough facts to enable him by such further investigation as the facts would induce in a reasonable person to sue within a year." *Fujisawa Pharm. Co., Ltd. v. Kapoor*, 115 F.3d 1332, 1334 (7th Cir. 1997) (quoting *Law v. Medco Research, Inc.*, 113 F.3d 781, 785 (7th Cir. 1997)). More than "merely suspicious circumstances" must exist to put a potential plaintiff on inquiry notice; he "must learn of a circumstance that places him 'in possession of, or with ready access to, the essential facts that he

needs in order to be able to sue.'" *Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 670 (7th Cir. 1998) (quoting *Fujisawa*, 115 F.3d at 1337). Whether a plaintiff had sufficient facts to put him on inquiry notice of a securities fraud claim is a question of fact, thus it may be "inappropriate for resolution on a motion to dismiss under Rule 12(b)(6)." *Marks v. CDW Computer Ctrs., Inc.*, 122 F.3d 363, 367 (7th Cir. 1997).

Courts consider both a party's ease of access to evidence that would lead to an appropriate investigation and the presence or absence of a "trigger" or "suspicious circumstance" that would cause a party "to exploit the access." *See Marks*, 122 F.3d at 368; *see also Fujisawa*, 115 F.3d at 1335. "An open door is not by itself a reason to enter a room ... *How* suspicious the circumstance need be to set the statute of limitations running ... will depend on how easy it is to obtain the necessary proof by a diligent investigation aimed at confirming or dispelling the suspicion." *Fujisawa*, 115 F.3d at 1335.

SOM contends that it had sufficient facts to put it on inquiry notice in March 2003 or, at the very earliest, October 2002, when it learned that defendants had offered Class A units to other buyers at lower valuations and when MacInnis refused to clarify the method by which Muzak and Holdings valued the 143 Units. Holdings argues, however, that SOM was on inquiry notice as of the May 17, 2001 Warning Letter or, at the latest, May 31, 2001, when the APA was signed. Specifically, Holdings argues that the exhibits attached to SOM's complaint clarify that SOM had sufficient facts about the units to be on notice that they were not worth $1 million by no later than May 31, 2001. The May 17, 2001 Warning Letter advised SOM that there was no market for the Units, that Holdings had no operations or assets except for Muzak, that Muzak had only net losses from operations, and that Holdings had approximately "substantial debt" of

$385 million. Further, Holdings contends that the APA itself reiterated many of these disclosures and, additionally, contained representations that the owners of SOM were "sophisticated in financial matters," understood that there were restrictions on the units transferability, and had had "full access" to information regarding the units, Muzak, and Holdings. Holdings avers that the APA contained a non-reliance clause in paragraph 13.9.[3]

SOM contends that ¶ 13.9 represents only an integration clause, not a non-reliance clause. According to SOM, defendants cannot rely on the Warning Letter, because it has been superseded by the APA. Thus, SOM can rely on its subsequent inquiries to defendants and on the terms of the APA itself, including Schedule 2.1 in bringing this complaint.

The standard for determining when a party is put on inquiry notice does not address reliance or non-reliance issues. It is not interested in whether an agreement is integrated or not. Instead, it asks the simple question: when did the party know enough to realize the need for further investigation which would permit a suit within the applicable time period? The Warning Letter does not provide nearly the red-flag raising function that Defendants would claim. Much of the letter constitutes standard warnings to investors. Any business venture is likely to face unknown or unpredictable future market conditions; that is, to some extent, the nature of a competitive industry. The fact that Holdings had no operations beyond its ownership of Muzak is hardly surprising, nor are the facts that changes in market interest rates and amount of debt might affect the company's "leveraged structure." But these all describe forward-looking scenarios; they do not purport to disclose that Holdings' or Muzak's financial or market situation were

---

[3] In its briefs, Holdings refers to the clause as an "anti-reliance clause" but the relevant case law describes the clause at issue as a "no reliance" or "non-reliance" clause, which this Court finds a more appropriate description.

under strain at the time of the Warning Letter. Thus, SOM could reasonably have understood from the LOI and the APA, including the attached Schedule 2.1, that the purchase price for SOM's assets was approximately $1 million in cash in addition to 143 Units of Class A Stock, valued at $1 million at the time. That is, in fact, what SOM is arguing. Thus, SOM properly alleges that it did not have reason to doubt the valuation of the 143 units of Class A Stock until October 2002 at the earliest. Therefore SOM's Count I falls under the two-year statute of limitations pursuant to the Sarbanes-Oxley Act and was timely-filed.

### 3. Required Elements of Securities Fraud Claim Under PSLRA

Under the PSLRA, a plaintiff must plead a securities law violation with particularity and must provide "sufficient facts to convince a court at the outset that the defendants likely intended 'to deceive, manipulate, or defraud.'" *Makor*, 2006 WL 172412, at *4 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n.12 (1976)).

With respect to the first part of the PSLRA heightened pleading requirement, the Seventh Circuit has identified the "relevant question" as "'whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission.'" *Makor*, 2006 WL 172412, at * 5 (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000)). The materiality of a particular statement or omission depends, in turn, on "whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company." *Makor*, 2006 WL 172412, at * 6.

SOM alleges that the defendants represented both orally and in writing until no earlier than October 2002 that the 143 units of stock had a present value of $1 million. In the complaint, SOM explicitly alleges that Muzak offered to purchase SOM's business assets for a purchase

price that included "Muzak, LLC stock of $1 million (143 units)." (Am. Compl., ¶ 8). SOM contends that during the sale negotiations, an officer of Muzak orally informed SOM that the CEO of Holdings "got you the million dollars in stock." (Am. Compl., ¶ 9). The parties then entered into the APA, which provided that Plaintiff was to received cash plus 143 units of Class A stock. Attached to the APA was a cash analysis sheet, identified in the APA as Schedule 2.1, which specifically represented that "$1 million of the purchase price set forth in the Agreement would be paid by the transfer to Plaintiff of 143 Class A units." (Am. Compl., ¶ 11). SOM asserts that defendant MacInnis "used standard methods of valuation" to determine the present value of the units because "there was no established public trading market" for them. (Am. Compl., ¶ 15). Thus, "[a]t all relevant times prior to and at the time of the purchase," defendants represented "that the 143 units acquired by Plaintiff had a present value of $1 million...." (Am. Compl., ¶ 14). Plaintiff further alleges that in October 2002, it began inquiring of Defendant Muzak as to how the $1 million value of the units was calculated and whether that was the true value as of the dates of the LOI and the APA. Muzak first responded by fax, repeating the representations contained in the Warning Letter.[4] (Am. Compl., ¶ 16). Plaintiff inquired again in December 2002, and January 2003. On January 22, 2003, MacInnis emailed Plaintiff and stated that he no longer had either an electronic or a hard copy of the model prepared in 2001, and that "it is also not a reasonable use of our scarce resources to re-construct a model from approx[imately] 2 years ago at this point in time." (Am. Compl., Ex. 5, at 1). Finally, on March 21, 2003, MacInnis sent a letter to SOM and its counsel, describing the $1 million value as "the

---

[4] Plaintiff's amended complaint indicates that this fax response was attached as an exhibit, but no such exhibit appears with the amended complaint filed with this Court.

value that [Defendants] *expected* the units would ultimately deliver," based on their "best-guess" about "the timing of a liquidity event and the valuation multiple that would apply in that liquidity event." (Am. Compl., Ex. 6, at 1). Thus, the purchase price agreed to in the APA did not represent 45 times Plaintiff's monthly billings, despite the representations of the defendants in the APA, but rather some undetermined lesser sum. Furthermore, defendants knew that the units did not have a "present value" of $1 million at the time of the APA but did not disclose that fact.

Defendants argue that Plaintiff and plaintiff's counsel participated in discussions prior to the APA about the calculation of the purchase price. In his March 21, 2003 letter, MacInnis stated that the financial model used to calculate the units' "projected value" was based on "a number of assumptions, such assumptions which were discussed with you both (and agreed to) prior to the closing of the transaction." (Am. Compl., Ex. 6, at 1). But the language of the APA is silent as to whether the value of the units was present value or projected future value. Paragraph 2.1 of the APA sets forth the consideration for Plaintiff's business assets as $938,696.20 in cash, plus 143 Class A Units of Holdings. (Am. Compl., Ex. 2, ¶ 2.1). The attached Schedule 2.1, which sets out the adjusted cash price of SOM's assets, gives a value of $1 million for the units. Nowhere in the APA or in the pre-closing correspondence is there any disclosure or notification that the $1 million represented an expected or projected future value. Defendants make much of Plaintiff's status as "sophisticated investors" in their briefs and note that Plaintiff was represented by counsel during the purchase negotiations. This is an argument that cuts both ways. Defendants also were sophisticated investors and business people. If it is true, as they claimed in March 2003, that the parties understood the units to have a $1 million projected value, then there was nothing to prevent them from memorializing this understanding in the APA. The

parties chose not to do so, however, and the first mention of projected value comes almost two years later.

A word about the so-called integration clause of the APA is in order. "[T]he general rule [is] that parol evidence is not admissible for the purpose of adding to, modifying, or contradicting the terms of a written contract.... Such evidence, however, is admitted, not for the purpose of importing into a writing an intention not expressed therein, but with the view of elucidating the meaning of the words employed. Evidence of this character is admitted for the purpose of aiding in the interpretation of what is in the instrument, and not for the purpose of showing intention independent of the instrument." *U.S. Life Credit Life Ins. Co. v. Williams*, 919 P.2d 594, 597 (Wash. 1996).[5] This Court finds initially that the parties did not necessarily intend the APA to reflect the complete agreement between the parties simply because they included the integration clause. Of course, the presence of an integration clause is strong evidence that the parties intended the writing to reflect the complete and exclusive agreement between them, but such a clause is not dispositive. *L.S. Heath & Son, Inc. v. AT&T Information Sys., Inc.*, 9 F.3d 561, 569 (7th Cir. 1991) (quoting *Sierra Diesel Injection Serv. Inc. v. Burroughs Corp., Inc.*, 890 F.2d 108, 112 (9th Cir. 1989)). In order to determine whether the parties intended the APA to be

---

[5] Paragraph 13.11 of the APA provides that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of Washington, without regard to its conflicts of law principles. The parties agree that the exclusive jurisdiction and venue of any lawsuit between them arising under this Agreement or the transactions contemplated herein shall be the Circuit Court of Cook County, Illinois or the United States District Court for the Northern District, Eastern Division of Illinois and each of the parties hereby irrevocably agrees and submits itself to the exclusive jurisdiction and venue of such courts for the purposes of such lawsuit." (Am. Compl., Ex. 2, ¶ 13.11). This Court will respect the choice of law clause in a valid contract as long as the law chosen is not contrary to Illinois' public policy. *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 705 (7th Cir. 2004).

the complete and exclusive agreement between them, this Court must compare the APA with all prior and contemporaneous negotiations. *Emrich v. Connell*, 716 P.2d 863, 866 (Wash. 1986). If after hearing all relevant extrinsic evidence, the court determines that the parties intended the writing (e.g., the APA) to be "a final expression of the terms it contains but not a complete expression of all terms agreed upon–i.e., partially integrated–then the terms not included in the writing may be proved by extrinsic evidence only insofar as they are not inconsistent with the written terms." *Id.* (citing *Black v. Evergreen Land Developers, Inc.*, 450 P.2d 470, 475 (Wash. 1969); *University Properties, Inc. v. Moss*, 388 P.2d 543, 544-45 (Wash. 1964); *Buyken v. Ertner*, 205 P.2d 628, 634 (Wash. 1949)).

Based on this reasoning, Plaintiff has alleged sufficient facts that it is reasonable to determine that the APA fails to reflect the complete agreement between the two parties. The parties had negotiated about the stock portion of the purchase price, specifically about whether Muzak would come up to $1 million worth of its Class A units to SOM. The APA references the number of Class A shares, and there is no dispute that Plaintiff received less than the number of shares stated. Given the negotiations about the allocation of the purchase price between cash and securities, Defendants' assurance to SOM that Holdings' CEO "got you the $1 million," and the line entry on Schedule 2.1 noting a value of $1 million for an unspecified number of units of securities, it is reasonable to find that the APA and Schedule 2.1 were meant to be read together. Thus, Schedule 2.1 serves to clarify the ambiguity about the value of the Class A units portion of the purchase price. This Court therefore finds that the APA does not reflect the complete and exclusive agreement between the parties, despite the inclusion of the so-called integration clause. In addition, this Court assumes for the purpose of this motion that Schedule 2.1 is part of the

agreement and therefore reflects an understanding that the 143 Units had a present value of $1 million.

SOM must allege not only materiality, of course, but also scienter. The PSLRA addressed the perceived abuse of securities laws by private litigants by requiring that the complaint "with respect to each act of omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *see also Makor*, 2006 WL 172142, at * 10. The Seventh Circuit recently stated that it applies the same scienter standard as it did prior to the passage of the PSLRA: "an extreme departure from the standards of ordinary care, [ ] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977) (quotation omitted) (quoted in *Makor*, 2006 WL 172142, at *10). In addition, the Seventh Circuit states that "the best approach is for courts to examine all of the allegations in the complaint and then to decide whether collectively they establish [a strong inference of scienter]." *Makor*, 2006 WL 172142, at *11. Specifically, a "complaint [will] survive if it alleges facts from which, if true, a reasonable person could infer that the defendant acted with the required intent." *Id*. at *12. In cases with multiple defendants, the Seventh Circuit requires plaintiffs to "create this inference with respect to each individual defendant." *Id*.

SOM alleges that defendants MacInnis and Muzak represented to plaintiff that the 143 units had a present value of $1 million based on "standard methods of valuation [because] there was no established public trading market for the securities." (Am. Compl., ¶ 15). Plaintiff met with the CEO of Holdings prior to the LOI, and requested $1 million worth of Holdings stock as

part of the purchase price. Holdings initially offered only $400,000 in stock. After additional negotiations, however, Holdings informed Plaintiff that its CEO had received authorization to offer $1 million in stock. Further, the defendants represented that Muzak was a wholly-owned subsidiary of Holdings and that both Muzak and Holdings were parties to the APA. In addition, ABRY was the beneficial owner of Holdings.

Defendants contend that the APA contains a non-reliance clause which prevents Plaintiff from relying on any representation, oral or written, made prior to the APA. It is not clear to this Court that there is, in fact, a non-reliance clause in the APA. Assuming for the limited purposes of this motion that there was, however, it is clear that Muzak and Holdings were parties to the Agreement and that MacInnis signed the APA on behalf of both companies. Thus, any representations contained therein reasonably may be imputed to each defendant. Defendants then argue that Plaintiff may not rely on Schedule 2.1 because the APA does not warranty or represent that Schedule 2.1 was accurate. This argument beggars belief. Schedule 2.1 is described in the APA as the schedule of adjustments to the cash portion of the purchase price. Neither in the APA nor on the Schedule is there any disclaimer to the effect that the cash portion adjustments may be relied upon but the valuation of the stock units may not. It was reasonable for Plaintiff to rely on the information contained in Schedule 2.1 not only for the calculation of the cash portion of the purchase price but also for the value of the securities portion. Finding otherwise runs counter to the statutory purpose of promoting transparency in securities transactions, but rather rewards secrecy and manipulation.

This Court finds that a reasonable person could draw an inference from the facts alleged in the amended complaint that defendants Muzak, Holdings, and MacInnis each knew that their statements about the value of the 143 units were false or misleading.

This Court finds that Plaintiff has met its pleading burden under the PSLRA. SOM has alleged that defendants misrepresented the value of the Class A units as $1 million in *present* value, not *projected* value, which was a material fact to the calculation of the purchase price and the ultimate closing of the deal. Further, SOM has alleged facts sufficient to show at this point in the proceedings that Defendants acted with the requisite knowledge because they constructed the financial model on which the valuation was based, and because they had the opportunity to memorialize that the value of the shares was based on projected value but chose not to do so. A fair inference from the allegations of the complaint is that the units were worth less than what was represented because soon after May 31, 2001, Defendants allegedly sold Units for less. There is no dispute that the alleged statements or misrepresentations about the stock valuation occurred in connection with the sale of SOM's business assets. Plaintiff has alleged that it relied on Defendants' statements in accepting the purchase price and closing the deal, and that this reliance proximately caused its injuries. In short, SOM entered the APA believing it was receiving 143 units of Class A stock with a present value of $1 million. Instead, it received 143 units of Class A stock with a possible future value, at some undisclosed date, of $1 million. SOM contracted to sell its business assets for a purchase price of $2 million in cash and stock, but only received $938,696.20 in cash and stock units worth less than $1 million. This Court finds, therefore, that SOM has stated a claim for violation of § 10(b) of the Securities Exchange Act of 1934.

Defendants also argue that Plaintiff's breach of contract claim must be dismissed because Plaintiff received the benefit of its bargain. As stated above, Plaintiff has alleged sufficient facts to establish that it bargained for 143 units of Class A stock with a present value of $1.0 million dollars. What it received, however, was 143 units of Class A stock with a *projected* value of $1 million. This is sufficient to state a claim for breach of contract.

Defendants then argue that SOM's common law fraud claim fails because SOM has suffered no damage. This argument is unavailing, as discussed above. Defendants' argument appears to turn on the fact that the securities are illiquid and therefore could not be sold when transferred. Thus, it contends that "even if the Units were not worth $1 million when transferred to Plaintiff, Plaintiff has suffered no damages." *Ford v. Trendwest Resorts, Inc.*, 43 P.3d 1223, 1228 (Wash. 2002). But this overlooks the fact that Plaintiff has alleged that SOM bargained for the equivalent of $1 million in Class A units, but received something different. Perhaps Defendants will prove that lack of liquidity rendered the Units valueless on the date of transfer, but until they do, SOM's allegation that it got less than what Defendants represented will suffice. Of course, if Defendants "prove" that the Units were worth less than what was represented, then they have a different problem. SOM therefore has alleged standard "benefit of the bargain" damages, that is, the difference between "the difference between the value of the stock had the misrepresentations been true and the actual value." *Turner v. Enders*, 552 P.2d 694, 697 (Wash. Ct. App. 1976).

## Conclusion

For the foregoing reasons, Defendants' motion to dismiss is DENIED. Defendants' motion to strike is GRANTED.

Enter:

/s/ David H. Coar
_____
David H. Coar
United States District Judge

Dated: **February 28, 2006**